# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

March 13, 2018

Lyle W. Cayce
Clerk

No. 17-50762

CITY OF EL CENIZO, TEXAS; RAUL L. REYES, Mayor, City of El Cenizo; TOM SCHMERBER, County Sheriff; MARIO A. HERNANDEZ, Maverick County Constable Pct. 3-1; LEAGUE OF UNITED LATIN AMERICAN CITIZENS; MAVERICK COUNTY,

Plaintiffs - Appellees Cross-Appellants

CITY OF AUSTIN, JUDGE SARAH ECKHARDT, in her Official Capacity as Travis County Judge; SHERIFF SALLY HERNANDEZ, in her Official Capacity as Travis County Sheriff; TRAVIS COUNTY; CITY OF DALLAS, TEXAS; THE CITY OF HOUSTON,

Intervenors - Plaintiffs - Appellees Cross-Appellants

v.

STATE OF TEXAS; GREG ABBOTT, Governor of the State of Texas, in his Official Capacity, KEN PAXTON, Texas Attorney General,

Defendants - Appellants Cross-Appellees

-------------------------------------------------------------------------------------------------------------

EL PASO COUNTY; RICHARD WILES, Sheriff of El Paso County, in his Official Capacity; TEXAS ORGANIZING PROJECT EDUCATION FUND; JO ANNE BERNAL, El Paso County Attorney in her Official Capacity; MOVE San Antonio,

Plaintiffs - Appellees Cross-Appellants

TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND COUNTY COMMISSIONERS,

Intervenor - Plaintiff - Appellee Cross-Appellant

No. 17-50762

v.

STATE OF TEXAS; GREG ABBOTT, Governor; KEN PAXTON, Attorney
General; STEVE MCCRAW, Director of the Texas Department of Public
Safety,

Defendants - Appellants Cross-Appellees

-------------------------------------------------------------------------------------------------------------

CITY OF SAN ANTONIO; BEXAR COUNTY, TEXAS; REY A. SALDANA, in
his Official Capacity as San Antonio City Councilmember; TEXAS
ASSOCIATION OF CHICANOS IN HIGHER EDUCATION; LA UNION DEL
PUEBLO ENTERO, INCORPORATED; WORKERS DEFENSE PROJECT;
CITY OF EL PASO,

Plaintiffs - Appellees Cross-Appellants

CITY OF AUSTIN,

Intervenor Plaintiff - Appellees Cross-Appellants

v.

STATE OF TEXAS; KEN PAXTON, sued in his Official Capacity as Attorney
General of Texas; GREG ABBOTT, sued in his Official Capacity as Governor
of the State of Texas,

Defendants - Appellants Cross-Appellees

—————————————

Appeals from the United States District Court
for the Western District of Texas

—————————————

Before JONES, SMITH, and PRADO, Circuit Judges.

EDITH H. JONES, Circuit Judge:

No. 17-50762

Texas cities, counties, and local officials challenge Senate Bill 4 ("SB4"), a Texas law that forbids "sanctuary city" policies throughout the state. SB4 prohibits local authorities from limiting their cooperation with federal immigration enforcement, and it requires local officers to comply with Immigration and Customs Enforcement ("ICE") detainer requests. In their pre-enforcement lawsuit, the plaintiffs alleged a battery of constitutional violations: (I) SB4 is preempted by federal immigration law, (II) SB4's "endorse" prohibition violates the First and Fourteenth Amendments, (III) SB4's ICE-detainer mandate violates the Fourth Amendment, and (IV) SB4's phrase "materially limits" is unconstitutionally vague under the Fourteenth Amendment. The district court issued a preliminary injunction, enjoining several of the law's provisions. Texas appeals the injunction, and the plaintiffs cross-appeal the district court's refusal to issue a broader injunction. With one exception, SB4's provisions do not, on their face, violate the Constitution. For the following reasons, we uphold the statute in its entirety except for the application of the "endorsement" prohibition, Tex. Gov't Code § 752.053(a)(1), to elected officials.

## BACKGROUND

### I. Senate Bill 4

In May 2017, the Texas Legislature enacted Senate Bill 4 to prohibit sanctuary city policies. The law imposes duties on certain state officials and provides civil and criminal liability for violations of those duties. Three parts of the law are critical to this case: (A) the immigration-enforcement provisions, (B) the ICE-detainer mandate, and (C) the penalty provisions.

### A. Immigration-Enforcement Provisions

As codified at Texas Government Code § 752.053(a)-(b), SB4 forbids local entities from limiting the enforcement of federal immigration law. Subsections (a)(1) and (a)(2) of Section 752.053 provide broad prohibitions.

No. 17-50762

Under subsection (a)(1), a local entity may not "adopt, enforce, or endorse a policy under which [it] prohibits or materially limits" immigration enforcement. *Id.* § 752.053(a)(1). After subsection (a)(1) deals with anti-cooperation "policies," subsection (a)(2) further prohibits any "pattern or practice" that similarly frustrates enforcement. *Id.* § 752.053(a)(2).

Following the general prohibitions in (a)(1) and (a)(2), subsection (b) enumerates concrete examples of immigration-enforcement activities that a local entity may not "prohibit or materially limit." *Id.* § 752.053(b). These include (b)(1) "inquiring into the immigration status" of lawfully detained individuals, (b)(2) sharing immigration-status information with federal agencies, and (b)(3) "assisting or cooperating with a federal immigration officer as reasonable or necessary, including providing enforcement assistance." *Id.* § 752.053(b)(1)-(3).[1]

The prohibitions in Section 752.053 apply broadly to any "local entity or campus police department." *Id.* § 752.053(a)-(c). SB4 defines "local entity" to include the governing bodies of counties and municipalities as well as officers or employees of those authorities, including "a sheriff, municipal police department, municipal attorney,[ ] county attorney[,] . . . district attorney or criminal district attorney." *See id.* § 752.051(5)(A)-(C). But SB4 excludes hospitals, school districts, and certain community centers—as well as officers employed by these institutions—from the law's requirements. *See id.* § 752.052(a)-(f).

**B. ICE-detainer Mandate**

As codified at Texas Code of Criminal Procedure article 2.251, SB4's ICE-detainer mandate requires law-enforcement agencies to comply with detainer

---

[1] For convenience, these three provisions will be referred to as the "status-inquiry," "information-sharing," and "assistance-cooperation" provisions.

requests submitted by ICE. An ICE detainer is a written request to state or local officials, asking them (1) to notify the Department of Homeland Security ("DHS") as soon as practicable before an alien is released and (2) to maintain custody of the alien for up to 48 hours beyond the preexisting release date so that DHS may assume custody.[2] As of April 2017, ICE must make this request using Form I-247A, which must be accompanied by a signed administrative warrant. Form I-247A states that DHS has determined that there is probable cause that the subject of the request is a removable alien, and ICE officers check one of four boxes on the form to indicate the basis for probable cause. [3]

SB4's ICE-detainer mandate applies whenever "[a] law enforcement agency [ ] has custody of a person subject to" an ICE detainer. Tex. Code Crim. Proc. art. 2.251(a). Under subsection (a), the mandate requires law enforcement agencies to "comply with, honor, and fulfill" ICE's requests. *Id*. It also requires that the individual in custody be informed he "is being held pursuant to" an ICE detainer. *Id*. art. 2.251(a)(2).

Subsection (b) provides a lone exception to the detainer mandate: law enforcement agencies need not comply with detainers if shown "proof that the person is a citizen of the United States or . . . has lawful immigration status." *Id*. art. 2.251(b). Subsection (b) states that such "proof" could include a Texas driver's license or similar government-issued ID. *Id*. art. 2.251(b).

---

[2] *See* U.S. Immigration and Customs Enforcement, Policy No. 10074.2: Issuance of Immigration Detainers by ICE Immigration Officers (Mar. 24, 2017), available at https://perma.cc/T6FJ-FXL3.

[3] *See* U.S. Department of Homeland Security, Immigration Detainer – Notice of Action, DHS Form I-247A (3/17), available at https://perma.cc/RH4C-5D8Q.

## C. Penalty Provisions

SB4 is enforced through civil and criminal penalties by Texas's Attorney General. Private citizens may file complaints with the Attorney General, alleging by sworn statement that a local entity is violating the enforcement provisions. *See* Tex. Gov't Code § 752.055(a). Upon determining that such a complaint is valid, the Attorney General may file suit in state court to enforce the law. *See id.* § 752.055(b). If a court finds there has been a violation, local entities may be subject to fines of $1,000 to $1,500 for a first violation and $25,000 to $25,500 for subsequent ones, with each day of continuing violation constituting a separate violation. *See id.* § 752.056(a)-(b). If the Attorney General is presented with evidence that a public officer has violated the enforcement provisions, SB4 *requires* the Attorney General to file an enforcement action. *See id.* § 752.0565(b). Public officers found guilty of violating the law are subject to removal from office. *See id.* § 752.0565(c).

SB4 makes certain officials' failure to comply with SB4's ICE-detainer provision a misdemeanor. *See* Tex. Penal Code § 39.07(a)-(c). SB4 further requires Texas to indemnify local entities against any claim arising out of their good-faith compliance with an ICE-detainer request. *See* Tex. Gov't Code § 402.0241.

## II. Prior Proceedings

Before SB4 could go into effect, several Texas cities, counties, local law-enforcement and city officials, and advocacy groups challenged the law in three consolidated actions. The plaintiffs sought a preliminary injunction, and the district court found the plaintiffs likely to prevail on the following claims:

- Section 752.053(b)(3)'s assistance-cooperation provision is field and conflict preempted by federal immigration law;
- Section 752.053(a)(1)'s "endorse" prohibition violates the First and Fourteenth Amendments because it is overbroad, discriminates on the basis of viewpoint, and is unconstitutionally vague;

- Section 752.053(a)(1) and (a)(2)'s "materially limits" prohibitions are unconstitutionally vague under the Fourteenth Amendment; and

- Article 2.251's ICE-detainer mandate violates the Fourth Amendment.

Enjoining these provisions, the district court nevertheless rejected the plaintiffs' claims that SB4 was preempted more generally.

Following the district court's order, Texas moved this court to stay the injunction pending appeal. The stay panel granted the motion in part, finding Texas likely to prevail on the Fourth Amendment and preemption claims, and stayed the injunction as to article 2.251's ICE-detainer mandate and Section 752.053(b)(3)'s assistance-cooperation provision. *City of El Cenizo v. Texas*, No. 17-50762, 2017 WL 4250186, at *2 (5th Cir. Sept. 25, 2017). The stay panel left the injunction in place as to the "endorse" and the "materially limits" prohibitions, concluding that possible limiting constructions of these terms "are best left for the time when this court's ruling would have more finality." *Id.* Texas now appeals the preliminary injunction, and the plaintiffs cross-appeal the district court's refusal to enjoin SB4 completely.

## STANDARD OF REVIEW

"To be entitled to a preliminary injunction, the applicants must show (1) a substantial likelihood that they will prevail on the merits, (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted, (3) their substantial injury outweighs the threatened harm to the party whom they seek to enjoin, and (4) granting the preliminary injunction will not disserve the public interest." *Tex. Med. Providers Performing Abortion Servs. v. Lakey,* 667 F.3d 570, 574 (5th Cir. 2012) (brackets and citations omitted). This court "review[s] a preliminary injunction for abuse of discretion, reviewing findings of fact for clear error and conclusions of law *de novo.*" *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 537 (5th Cir. 2013)

(citations omitted).   Because the issues raised by the parties substantially overlap, we discuss the appeal and cross-appeal together.

## DISCUSSION

### I.  Preemption

Under the federal Constitution, "both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 398, 132 S. Ct. 2492, 2500 (2012). Because dual sovereignty allows for conflicts between state and federal legislation, the Constitution's Supremacy Clause provides that federal legislation "shall be the supreme Law of the Land."  U.S. Const. art. VI, cl. 2. Congress may preempt state legislation "by enacting a statute containing an express preemption provision," *Arizona*, 567 U.S. at 399, 132 S. Ct. at 2500-01, but this case does not involve express preemption.  Rather, the plaintiffs allege two forms of *implied* preemption:  field preemption and conflict preemption.

### A. Field Preemption

Field preemption occurs when "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399, 132 S. Ct. at 2501.  Although the Supreme Court has recognized field preemption claims, it has indicated courts should hesitate to infer field preemption unless plaintiffs show "that complete ouster of state power including state power to promulgate laws not in conflict with federal laws was 'the clear and manifest purpose of Congress.'" *De Canas v. Bica*, 424 U.S. 351, 357, 96 S. Ct. 933, 937 (1976) (quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 146, 83 S. Ct. 1210, 1219 (1963)); *see also Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 560 (5th Cir. 2013) (Higginson, J., specially concurring) (noting that *De Canas* forecloses sweeping field preemption claims).   Analyzing the relevant federal legislation, we

8

conclude that the plaintiffs have not satisfied this standard.  Congress has not preempted the field that SB4 regulates.

The district court found only one provision of SB4 field preempted. According to the district court, Section 752.053(b)(3)'s assistance-cooperation provision impermissibly regulates the field of "immigration enforcement," which Congress fully preempted through comprehensive regulation.  The plaintiffs now argue that SB4 is field-preempted in its entirety because Congress occupied the field of "federal-local cooperation in immigration enforcement."

As evidence that Congress has comprehensively regulated the relevant field, the plaintiffs point to federal statutes regulating local cooperation with immigration enforcement.  *See* 8 U.S.C. § 1324(c) (permitting local officers to make arrests for crimes of immigrant smuggling, transporting, or harboring); *id.* § 1252c (authorizing local officers to make arrests to enforce criminal reentry provisions following INS "confirmation" of an individual's immigration status); *id.* § 1103(a)(10) (authorizing local officers to enforce immigration law if the Attorney General has "determine[d] that an actual or imminent mass influx of aliens . . . presents urgent circumstances"); *id.* §§ 1373, 1644 (requiring that state and local jurisdictions permit their officers to send, receive, and maintain "information regarding the citizenship or immigration status" of individuals).

In addition to these provisions, the plaintiffs rely heavily on 8 U.S.C. § 1357, which specifies immigration-officer functions and describes circumstances under which state and local officers can perform those functions. Under Section 1357, immigration-officer functions include the power "to interrogate" and "to arrest" aliens without a warrant.  *Id.* § 1357(a)(1)-(2). Section 1357 further provides that states and political subdivisions can enter into written agreements with the Federal Government, so that state and local

officers can perform immigration-officer functions.  *Id.* § 1357(g).   These "287(g)"[4] agreements require that local officers must be "determined by the Attorney General to be qualified"; that they receive appropriate training; that their powers and duties are set forth in a written agreement; and that they are "subject to the direction and supervision of the Attorney General."  *Id.* § 1357(g)(1)-(5).  States and municipalities may not be required to enter into these agreements.  *Id.* § 1357(g)(9).

Section 1357 also contains a critical savings clause.  *Id.* § 1357(g)(10). Because the parties' analysis focuses heavily on this provision, we quote it in full:

> (10) Nothing in this subsection shall be construed to require an agreement under this subsection in order for any officer or employee of a State or political subdivision of a State—
>
> (A) to communicate with the Attorney General regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States; or
>
> (B) otherwise to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States.

*Id.* § 1357(g)(10)(A)-(B).  Therefore, although Section 1357 creates a highly regulated scheme for adopting 287(g) agreements, it also expressly allows cooperation in immigration enforcement outside those agreements.  *Id.*

The plaintiffs' reliance on these provisions is misplaced; SB4 and the federal statutes involve different fields.  Federal law regulates *how* local entities may cooperate in immigration enforcement; SB4 specifies *whether* they cooperate.  One could perhaps define the field broadly enough to include both SB4 and federal legislation, but the relevant field should be defined narrowly.

---

[4] The term "287(g)" refers to the section of the Immigration and Nationality Act that authorized these agreements.  *Lunn v. Commonwealth*, 78 N.E.3d 1143, 1158 (Mass. 2017).

*See Arizona*, 567 U.S. at 400-01, 132 S. Ct. at 2501-02 (defining the relevant field as "alien registration"); *De Canas*, 424 U.S. at 360 n.8, 96 S. Ct. at 938 ("Every Act of Congress occupies some field, but we must know the boundaries of that field before we can say that it has precluded a state from the exercise of any power reserved to it by the Constitution.") (quoting *Hines v. Davidowitz*, 312 U.S. 52, 78-79, 61 S. Ct. 399, 410 (1941) (Stone, J., dissenting)).

To establish field preemption, moreover, the plaintiffs must prove that federal law evinces "the clear and manifest purpose of Congress" to preclude even complementary state legislation on the same subject. *De Canas*, 424 U.S. at 357, 96 S. Ct. at 937. Federal law does not suggest the intent—let alone a "clear and manifest" one—to prevent states from regulating *whether* their localities cooperate in immigration enforcement. Section 1357 does not require cooperation at all. *Id.* § 1357(g)(9). And the savings clause allowing cooperation without a 287(g) agreement indicates that some state and local regulation of cooperation is permissible. *See id.* § 1357(g)(10)(A)-(B).

There is a further weakness in this field preemption claim. The plaintiffs acknowledge that the Tenth Amendment prevents Congress from compelling Texas municipalities to cooperate in immigration enforcement. *See generally Printz v. United States*, 521 U.S. 898, 117 S. Ct. 2365 (1997). Congress could not pass a *federal* SB4. But if that is so, it seems impossible that Congress has occupied the field that SB4 regulates.

The district court's field preemption analysis underscores the difference between SB4 and the relevant federal legislation. The district court found that Section 1357 demonstrates Congress's intent to retain oversight over local immigration enforcement. But SB4 does nothing to strip oversight from the Federal Government. In its operation, SB4 is similar to one of the city ordinances some plaintiffs have themselves adopted. These ordinances regulate whether and to what extent the local entities will participate in

federal-local immigration enforcement cooperation.[5]   SB4 accomplishes the same goal on a state-wide level.  If SB4 is field preempted, so too are the local ordinances that regulate "federal-local cooperation in immigration enforcement."

While this accentuates the substantive difference between SB4 and the relevant federal legislation, the plaintiffs' arguments focusing on congressional intent sound principally in conflict preemption.  We analyze these below.

## B. Conflict Preemption

Conflict preemption occurs when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers*, 373 U.S. at 142-43, 83 S. Ct. at 1217, or when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67, 61 S. Ct. at 404.  The district court held that only Section 752.053(b)(3) and its related penalties were conflict preempted, but the plaintiffs now argue that other provisions of SB4 impliedly conflict with federal law.  We conclude that none of SB4's provisions conflict with federal law.

### i.   The Assistance-Cooperation Provision

Section 752.053(b)(3) of the Texas Government Code forbids any action that would "prohibit or materially limit" a specified official from "assisting or cooperating with a federal immigration officer as reasonable or necessary, including providing enforcement assistance."   *See* Tex. Gov't Code § 752.053(b)(3).  The plaintiffs argue that this provision is preempted for three reasons:   (1) it permits unilateral local immigration enforcement, (2) it authorizes local officers to perform immigration-officer functions without a

---

[5] For instance, the Maverick County Sheriff's Office has a policy under which it does "not participate or cooperate in the arrests of individuals for civil immigration violations."

287g agreement, and (3) it conflicts with the federal purpose that local cooperation in immigration enforcement be entirely voluntary.

The plaintiffs' first argument misconstrues the statute. Certainly, *Arizona* emphasized the "principle that the removal process is entrusted to the discretion of the Federal Government." *Arizona*, 567 U.S. at 409, 132 S. Ct. at 2506. And the Court found Section 6 of Arizona's SB1070 preempted because it granted local officers authority to conduct unilateral warrantless arrests of aliens suspected of being removable. *See id.* Unlike the statute in *Arizona*, however, SB4's assistance-cooperation provision does not authorize unilateral enforcement. Indeed, the phrase "assisting or cooperating" requires a predicate federal *request* for assistance. *See* Tex. Gov't Code § 752.053(b)(3). Subsection (b)(3) also specifies that this assistance and cooperation must occur "with a federal immigration officer as reasonable or necessary." *Id.* § 752.053(b)(3). SB4's assistance-cooperation provision does not permit local officials to act without federal direction and supervision.[6]

The plaintiffs' second argument suggests that subsection (b)(3) conflicts with federal law by allowing local officers to engage in immigration-officer functions absent the requirements imposed by 8 U.S.C. § 1357(g). The plaintiffs stress that these requirements—a written agreement, training, and direct supervision by DHS—ensure that immigration enforcement adheres to congressional priorities and prevents the mistreatment of noncitizens. Section 752.053(b)(3) allegedly ignores these requirements, thereby undermining federal law's delicate balance of statutory objectives.

---

[6] We also note that this provision does not require cooperation unless it is "reasonable or necessary." Tex. Gov't Code § 752.053(b)(3). Thus, as Texas acknowledges, this provision does not generally preclude immigration-neutral policies regarding bona fide resource allocation—e.g., policies regarding overtime or patrolling locations.

This argument discounts the savings clause in 8 U.S.C. § 1357(g)(10)(B), which explicitly provides that a 287(g) agreement is *not required* for states "otherwise to cooperate . . . in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." This provision indicates that Congress intended local cooperation without a formal agreement in a range of key enforcement functions. The plaintiffs rely on the word "otherwise" to argue that permissible cooperation must categorically exclude activities allowed under 287(g) agreements. We disagree. The savings clause clarifies that a 287(g) agreement is not required "(A) to communicate . . . or (B) otherwise to cooperate." *Id.* § 1357(g)(10)(A)-(B). In context, the word "otherwise" refers to subsection (A) and explains that subsection (B) permits cooperation *beyond* communication—communication itself being a form of cooperation.[7] The plaintiffs are wrong to suggest that this interpretation makes 287(g) agreements superfluous. Under these agreements, state and local officials become de facto immigration officers, competent to act on their own initiative. By contrast, Section 1357(g)(10)(B) and SB4's assistance-cooperation provision permit no unilateral enforcement activity.

The plaintiffs also contend that this savings clause allows for only case-by-case cooperation. Yet a "case-by-case" qualifier is absent from the statute's text. DHS guidance relied on by the plaintiffs also fails to support their argument. This guidance critiques "systematic" local enforcement that

---

[7] DHS guidance confirms our interpretation of "otherwise": "[1357(g)(10)(A)] must be read in light of subparagraph 1357(g)(10)(B), which immediately follows and provides for state and local officers to '*otherwise* cooperate' with the Secretary, without a written agreement. Because the INA thus deems communications referred to in subparagraph (A) to be another form of 'cooperation' . . . ." DHS, Guidance on State and Local Governments' Assistance in Immigration Enforcement and Related Matters (emphasis in original), available at https://www.dhs.gov/sites/default/files/publications/guidance-state-local-assistance-immigration-enforcement.pdf.

"conflicts with the policies or priorities set by the Federal Government or limits the ability of the Federal Government to exercise discretion under federal law whenever it deems appropriate."[8]   State action under SB4's assistance-cooperation provision will not conflict with federal priorities or limit federal discretion in this way because it requires a predicate federal request.  DHS guidance does not suggest that subsection (b)(3) authorizes conduct beyond what is allowed by Section 1357(g)(B)(10)'s savings clause.[9]

The plaintiffs' third conflict argument unnecessarily reads a preemptive purpose into federal law; they claim that subsection (b)(3) makes *mandatory* what Congress intended to be *voluntary*.  To support this argument, the plaintiffs observe that Section 1357(g) refers to both a "State" and a "political subdivision," and they infer that Congress *specifically intended* that "political subdivisions" be able to choose whether to cooperate in immigration enforcement.  The plaintiffs support this reading by pointing to 8 U.S.C. § 1373, which—somewhat like SB4's information-sharing provision—prohibits states and local entities from refusing to share federal immigration-status information.  According to the plaintiffs, Section 1373 proves that Congress could have required political subdivisions to cooperate more generally, but expressly chose not to do so.

The plaintiffs' arguments fail for two reasons.  First, recent Supreme Court decisions in this area undermine this implied congressional purpose.  In *Arizona*, for instance, the Supreme Court upheld state laws *mandating* immigration-status inquiries.  *See Arizona*, 567 U.S. at 411-415, 132 S. Ct. at

---

[8] *See id.*

[9] Indeed, DHS guidance also negates the plaintiffs' argument that SB4 goes beyond Section 1357(g)(10)(B)'s savings clause by allowing for "assistance" as well as "cooperation." In describing the conduct allowed under the savings clause, the DHS guidance uses a form of the word "assist" 40 times. *See id.*

2508-10.  Similarly, in *Chamber of Commerce of U.S. v. Whiting*, the Court upheld a state law *mandating* that employers check immigration status with an electronic-verification system.  563 U.S. 582, 611, 131 S. Ct. 1968, 1987 (2011) (concluding that state law fell within the Immigration Reform and Control Act's savings clause).  In neither case did federal law require these status inquiries.  Yet the Supreme Court did not suggest that the states' requirements conflicted with the congressional desire for *voluntary* cooperation.  Indeed, the Court has repeatedly rejected a "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives" because "such an endeavor would undercut the principle that it is Congress rather than the courts that preempts state law."  *Whiting*, 563 U.S. at 607, 131 S. Ct. at 1985 (citations omitted).

Second, and as noted earlier, the plaintiffs have admitted that, under the Tenth Amendment, Congress could not compel local entities to enforce immigration law.  If that is the case, Congress did not choose to make these laws voluntary; it could not have made them mandatory.  Section 1373 itself has not been immune from Tenth Amendment scrutiny.  *See City of New York v. United States*, 179 F.3d 29, 34-37 (2d Cir. 1999) (upholding the federal legislation "[g]iven the circumscribed nature of [the court's] inquiry").  Together with the shaky foundation of the plaintiffs' imputed purpose, the Tenth Amendment implications show that SB4's assistance-cooperation provision does not conflict with federal law.[10]

---

[10] Because the assistance-cooperation provision does not conflict with federal law, neither do the penalties attached to it.  When a state is allowed to substantively regulate conduct, it must be able to impose reasonable penalties to enforce those regulations.  *See, e.g., Whiting*, 563 U.S. at 605-07, 131 S. Ct. at 1984-85 (rejecting the dissent's reliance on the penalties attached to the valid regulation).

No. 17-50762

**ii.   The Status-Inquiry and Information-Sharing Provisions**

Section 752.053(b)(1) of the Texas Government Code, the status-inquiry provision, forbids local entities from preventing officers from "inquiring into the immigration status of a person under a lawful detention or under arrest." *See* Tex. Gov't Code § 752.053(b)(1).  Subsection (b)(2), the information-sharing provision, forbids local entities from preventing officers from maintaining immigration-status information and sharing it with federal agencies.  *See id.* § 752.053(b)(2).  Because the *Arizona* Court upheld equivalent sections of a state statute, the plaintiffs' arguments are insufficient to establish a conflict.

The plaintiffs contend that subsection (b)(1) authorizes "interrogation," which is an immigration-officer function under 8 U.S.C. § 1357(g)(a)(1).  But it is not clear why SB4's status-inquiry provision authorizes impermissible conduct but the provision upheld in *Arizona* did not.  In *Arizona*, the state law required local officers to make a "reasonable attempt . . . to determine the immigration status" of anyone who has been lawfully detained if "reasonable suspicion exists that the person is an alien and is unlawfully present in the United States." *Arizona*, 567 U.S. at 411, 132 S. Ct. at 2507.  The law also required that "[a]ny person who is arrested shall have the person's immigration status determined before the person is released." *Id.*

If anything, the statute in *Arizona* seems more problematic because it mandates status inquiries where SB4 merely forbids preventing those inquiries.  True, the Court in *Arizona* seemed to assume that status inquiries primarily involved communication with ICE and the statute in *Arizona* uses the word "reasonable." *See Arizona*, 567 U.S. at 411-12, 132 S. Ct. at 2507-08.  But no suspicion—reasonable or unreasonable—is required for officers to ask questions of lawfully-detained individuals. *See Muehler v. Mena*, 544 U.S. 93, 101, 125 S. Ct. 1465, 1471-72 (2005).  And it would be wrong to assume that SB4 authorizes unreasonable conduct where the statute's text does not require

17

it.  *See Arizona*, 567 U.S. at 415, 132 S. Ct. at 2510 (quoting *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 446, 80 S. Ct. 813, 817-18 (1960)) (noting that the Court's precedents "enjoin seeking out conflicts between state and federal regulation where none clearly exists").[11]

Regarding subsection (b)(2), the plaintiffs observe that this provision mirrors the federal information-sharing provisions in 8 U.S.C. § 1373 but imposes harsher penalties.  Section 1373, however, does not comprise any comprehensive regulatory framework with which SB4 could conflict.  As noted above, the Tenth Amendment would likely preclude Congress from enforcing Section 1373 with the penalties provided by SB4.  Moreover, the *Arizona* Court emphasized that Congress "has encouraged the sharing of information about possible immigration violations." *Arizona*, 567 U.S. at 412.  In light of *Arizona*, neither the status-inquiry nor the information-sharing provisions of SB4 are conflict preempted.[12]

## II.  The "Endorse" Prohibition

Section 752.053(a)(1) provides that a "local entity or campus police department" may not "*endorse* a policy under which the entity or department prohibits or materially limits the enforcement of immigration laws."  *See* Tex. Gov't Code § 752.053(a)(1) (emphasis added).  The term "local entity" includes not only governmental bodies like city councils and police departments, but also a series of elected officials and "officer[s] or employee[s]" of the listed

---

[11] The plaintiffs also rely on the fact that the Supreme Court merely held that Arizona's status-inquiry provision was not susceptible to a facial challenge.  But, of course, this case also involves a facial challenge.

[12] The plaintiffs also challenge subsections (a)(1) and (a)(2), which broadly forbid any "policy" or "pattern or practice" that "prohibits or materially limits the enforcement of immigration laws."  They argue that these subsections may authorize conduct that is impermissible under the federal savings clause, 8 U.S.C. § 1357(g)(10)(B), even if subsections (b)(1)-(3) do not.  We decline to infer a conflict based solely on speculation.  *See Arizona*, 567 U.S. at 415, 132 S. Ct. at 2510.

bodies. *See id.* § 752.051(5)(A)-(C). The district court concluded that the term "endorse" (1) was overbroad, (2) constituted viewpoint discrimination, and (3) was unconstitutionally vague. To the extent that "endorse" prohibits core political speech by elected officials, it is not "readily susceptible" to a limiting construction that avoids constitutional concerns. Accordingly, on different reasoning from that employed by the district court, we apply the principle of severability and reject the application of the "endorse" provision to elected officials covered by Section 752.053(a)(1).

We must begin by construing the state statute. *United States v. Williams*, 553 U.S. 285, 293, 128 S. Ct. 1830, 1838 (2008) ("[I]t is impossible to determine whether a statute reaches too far without first knowing what the statute covers."). Texas urges this court to adopt a narrowing construction that interprets "endorse" to mean "sanction" and limits the verb's scope to official speech.

Federal courts must accept a reasonable narrowing construction of a state law to preserve its constitutionality. *See Voting for Am., Inc., v. Steen*, 732 F.3d 382, 396 (5th Cir. 2013). However, a court has no authority to "'rewrite a . . . law to conform it to constitutional requirements,' for doing so would constitute a 'serious invasion of the legislative domain.'" *United States v. Stevens*, 559 U.S. 460, 481, 130 S. Ct. 1577, 1592 (2010) (citations omitted). A statute must be "readily susceptible" to a construction for a court to adopt it. *Id.*; *see also Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216-17, 95 S. Ct. 2268, 2276 (1975) (refusing to adopt a limiting construction because "the ordinance by its plain terms [was] not easily susceptible of" one).

No. 17-50762

The verb "endorse" literally means "to write on the back of (a document),"[13] but there is no question that the figurative meaning of the verb includes the broad significance the district court ascribed to it.[14] As shown by the district court's survey of dictionary definitions, the most common meaning of "endorse" encompasses "a recommendation, suggestion, comment, or other expression in support of or in favor of an idea or viewpoint that is generally conveyed openly or publicly." Texas is also correct, however, that the verb "sanction" is a common definition for "endorse."[15] And the verb "sanction" denotes the use of official authority to ratify or authorize.[16] The question here is not just whether "endorse" is susceptible to the meaning that Texas proposes, but whether it is reasonable to limit the word accordingly.

For several reasons, we do not find the "endorse" prohibition readily susceptible to this limitation. First, the *noscitur a sociis* canon does not

---

[13] *See* The Oxford English Dictionary (online ed. 2017), available at http://www.oed.com/view/Entry/61987?rskey=smXJfK&result=2&isAdvanced=false#eid.

[14] *See* The American Heritage Dictionary of the English Language (online ed. 2017) (defining "endorse" as "[t]o express approval of . . . especially by public statement"), available at https://ahdictionary.com/word/search.html?q=endorse; Webster's New World College Dictionary (online ed. 2017) (offering "to give approval to; support" as possible definitions of endorse), available at http://www.yourdictionary.com/endorse.

[15] *See* The Oxford English Dictionary (online ed. 2017) (defining the figurative sense of "endorse" as "[t]o confirm, sanction"), available at http://www.oed.com/view/Entry/61987?rskey=smXJfK&result=2&isAdvanced=false#eid; The American Heritage Dictionary of the English Language (online ed. 2017) (listing "sanction" as a secondary meaning of "endorse"), available at https://ahdictionary.com/word/search.html?q=endorse; Webster's New World College Dictionary (online ed. 2017) (same), available at http://www.yourdictionary.com/endorse.

[16] *See* The American Heritage Dictionary (online ed. 2017) (defining "sanction" as "[t]o give official authorization or approval to"), available at https://ahdictionary.com/word/search.html?q=sanction; The Oxford English Dictionary (online ed. 2017) (defining "sanction" as "[t]o ratify or confirm by sanction or solemn enactment; to invest with legal or sovereign authority; to make valid or binding"), available at http://www.oed.com/view/Entry/170491?rskey=VpyOmv&result=2&isAdvanced=false#eid.

support the state's argument. This canon explains that, "[w]hen several nouns or verbs or adjectives or adverbs—any words—are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar." *See* Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 195 (2012). This canon does not imbue words with unnatural meaning, but serves "rather to limit a general term to a subset of all the things or actions that it covers." *See id*. at 196. For instance, in *United States v. Williams*, the Supreme Court relied on this canon to find that a statute only penalized "speech that accompanies or seeks to induce a transfer of child pornography." 553 U.S. 285, 294, 128 S. Ct. 1830, 1839 (2008). In *Williams*, the relevant list of verbs was "advertises, promotes, presents, distributes, or solicits." *Id*. The Court recognized that the verbs "promotes" and "presents" were "susceptible of multiple and wide-ranging meanings," which would, like a broad construction of "endorse," cover much protected speech. *Id*. To avoid the First Amendment problem, the Court used *noscitur a sociis* to narrow "promotes" and "presents" to their "transactional connotation." *Id*.

Using *noscitur a sociis* here to limit "endorse" to the meaning it shares with "adopt" and "enforce" renders "endorse" either superfluous or meaningless. To the extent that all three verbs connote the exercise of government authority to develop and administer policy, "endorse" (as interpreted by the state to mean "officially sanction") adds nothing of substance to the prohibitions against an entity's actually "adopting" or "enforcing" policies at odds with SB4. Without putting action behind his "sanction," an official who merely "endorses" impermissible policies has not "adopted" or "enforced" them, no matter the amount of speech he has devoted to that end. The official's "sanction" is toothless. Alternatively, if an official's "sanction" is functionally equivalent to "adopting" or "enforcing" impermissible policies, the

word becomes wholly redundant. There is no generic context, like the "transactional context" noted in *Williams*, in which "endorse," read to mean "sanction," conveys additional meaning to this provision.

Second, that the clause following "endorse" prohibits the endorsement of "a policy under which *the entity or department* limits the enforcement of immigration laws" does not support the state's narrow interpretation of "endorse." *See* Tex. Gov't Code § 752.053(a)(1) (emphasis added). Granted, under this qualifying phrase, SB4 does not regulate any statements approving hypothetical policies or the policies of any other entity of government. But as we have explained, the "endorsement" as "sanction" of policies contrary to SB4, without accompanying action to "adopt" or "enforce" such policies, is "mere" core political speech. This provision's qualifying language accentuates the overlap between "official" and "individual" speech that the state erroneously attempts to deny. As the plaintiffs point out, under the state's rationale, a local sheriff may violate SB4 by answering questions at a local town hall meeting or press conference or testifying to a legislative committee.[17]

In sum, we are unpersuaded that, taken in context, "endorse" "readily" bears the restrictive meaning urged by the state. As written, SB4 proscribes core political speech when such "endorsement" is uttered by elected officials. The state cannot regulate the substance of elected officials' speech under the First Amendment without passing the strict scrutiny test. *See Williams-Yulee v. The Fla. Bar,* 135 S. Ct. 1656, 1665-66 (2015). The state concedes that if

---

[17] The plaintiffs are incorrect that related provisions of SB4 bear on the First Amendment argument. Exemptions from SB4 when an officer works off-duty for an exempt entity like a charter school, *see, e.g.*, Tex. Gov't Code § 752.052, simply determine whether SB4 applies at all, not what speech it covers. Nor is it significant that "a statement by [a] public officer" may constitute evidence that an entity has violated SB4. *See id*. § 752.0565(b). It is unremarkable that "statements" could be probative of a local entity's policy or pattern or practice of limiting immigration enforcement.

"endorse" bears its most common and natural meaning, this provision does not pass constitutional muster as applied to elected officials.  In light of the infringement of this provision on elected officials' core political speech, the state's concession necessarily applies to the elements required for injunctive relief.  *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2690 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295-97 (5th Cir. 2012).

This conclusion does not, however, insulate non-elected officials and employees, who may well be obliged to follow the dictates of SB4 as "government speech."   *See Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S. Ct. 1951, 1960 (2006) ("We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline").  In the context of *government* speech, a state may endorse a specific viewpoint and require government agents to do the same.  *See, e.g.*, *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2253 (2015) (rejecting viewpoint discrimination claim after finding that the specialty license plates at issue constituted government speech).

Such issues are not properly before us because the appellees do not represent the public employees putatively covered by *Garcetti* and the government speech doctrine.  The Supreme Court has directed that "the lawfulness of the particular application of the law should ordinarily be decided first" before mounting "gratuitous wholesale attacks" under the overbreadth doctrine.  *See Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 485, 109 S. Ct. 3028, 3037 (1989).  Accordingly, we "resist the pulls to decide the constitutional issues involved in this case on a broader basis than the record

before us imperatively requires." *Serafine v. Branaman*, 810 F.3d 354, 363 (5th Cir. 2016) (quoting *Street v. New York*, 394 U.S. 576, 581, 89 S. Ct. 1354, 1360 (1969)).

Consistently with but more narrowly than the district court, we affirm the district court's injunction against enforcement of Section 752.053(a)(1) only as it prohibits elected officials from "endors[ing] a policy under which the entity or department prohibits or materially limits the enforcement of immigration laws."

## III.  The ICE-Detainer Mandate

Article 2.251(a) provides that law enforcement agencies "that ha[ve] custody of a person subject to an immigration detainer request . . . shall: (1) comply with, honor, and fulfill any request made in the detainer request . . . and (2) inform the person that the person is being held pursuant to" that request.  Tex. Code Crim. Proc. art. 2.251(a)(1)-(2).  Law enforcement agencies are exempt from the duty imposed by subsection (a) when the individual in custody "has provided proof that the person is a citizen of the United States or that the person has lawful immigration status in the United States, such as a Texas driver's license or similar government-issued identification."  *Id.* art. 2.251(b).  The district court held that the ICE-detainer mandate violates the Fourth Amendment because it is not reasonable for local officials to detain persons based on probable cause of removability.

Before reviewing the merits of this issue, we are obliged to address the threshold question whether the plaintiffs have standing to challenge the ICE-detainer mandate.  Standing in federal court requires that the plaintiffs "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136 (1992)).

24

The plaintiffs contend that they satisfy these requirements because the ICE-detainer mandate would force plaintiff local government officials to choose between violating their oaths of office to defend the U.S. Constitution and facing criminal penalties and expulsion from office. We agree. There is no question that the second and third prongs of the standing analysis are met. The injury claimed by the plaintiffs stems directly from Texas's enactment of the ICE-detainer mandate. Judicial invalidation of the mandate would obviate the plaintiffs' concerns. Accordingly, we need assess only whether the plaintiffs have alleged a sufficient injury.

In *Board of Education v. Allen*, the Supreme Court concluded that school board officials had standing to challenge a state statute requiring school districts to purchase and loan textbooks to students enrolled in parochial schools. 392 U.S. 236, 241 n.5, 88 S. Ct. 1923, 1925 (1968). The Court explained, "[b]elieving [state law] to be unconstitutional, [the plaintiffs] are in the position of having to choose between violating their oath and taking a step—refusal to comply with [state law]—that would be likely to bring their expulsion from office and also a reduction in state funds for their school districts." *Id.* This court's decisions applying *Allen* have explained that it is not enough for public officials to assert as an "injury" the violation of their oaths of office where no adverse consequences would occur. *See, e.g.*, *Finch v. Miss. State Med. Ass'n,* 585 F.2d 765, 774-75 (5th Cir. 1978) (observing that the plaintiff Governor was "certainly in no danger of expulsion [from office] at the hands of the defendant professional associations" and that "there is no allegation that his office is in any danger of a loss of funds . . . if the Governor refuses to comply with the statute"); *Donelon v. La. Div. of Admin. Law*, 522 F.3d 564, 567 (5th Cir. 2008) (denying standing for Louisiana Commissioner of Insurance); *Crane v. Johnson*, 783 F.3d 244, 253 (5th Cir.

No. 17-50762

2015) ("Under the Fifth Circuit precedent, [ICE agents'] violation of [ ] oath alone is an insufficient injury to support standing.").

In this case, plaintiff government officials have a claim to standing analogous to the school board members in *Allen*. The plaintiff government officials face criminal penalties in addition to civil fines and expulsion from office if they disobey the ICE-detainer mandate. And if they comply with the allegedly unconstitutional mandate, the violation of their oaths is not the only putative injury; any ICE-detainer mandate enforcement actions that knowingly violate detainees' Fourth Amendment rights could expose the plaintiffs to damage suits.[18] The plaintiff government officials have a sufficient "personal stake" to press their claim based on alleged violation of their oaths and potentially severe personal consequences, and we may proceed to the merits. *See Donelon*, 522 F.3d at 568.

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV.[19] A constitutional seizure of a criminal defendant must generally be supported by probable cause. Nevertheless, this case does not involve whether probable cause existed in a particular instance: it is a pre-enforcement facial challenge. Such a challenge

---

[18] It is true that SB4 provides the possibility of indemnification for certain civil lawsuits arising from good-faith compliance with the ICE-detainer mandate. *See* Tex. Gov't Code § 402.0241. But this possibility is cold comfort for the plaintiffs when the statute leaves it to Texas to determine whether an entity has engaged in "good-faith compliance" warranting indemnification. *See id.* § 402.0241(b)(2).

[19] We pretermit the question whether the Fourth Amendment even applies to many aliens subject to ICE-detainer requests. *See Castro v. Cabrera*, 742 F.3d 595, 600 (5th Cir. 2014) (holding that the "entry fiction" applies to preclude illegal aliens' Fourth Amendment detention claims); *United States v. Portillo*-Munoz, 643 F.3d 437, 440 (5th Cir. 2011) (noting that the Supreme Court has never "held that the Fourth Amendment extends to a native and citizen of another nation who entered and remained in the United States illegally"); *but see Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 624-25 (5th Cir. 2006) (holding that an alien with substantial connections to the United States "may bring a *Bivens* claim for unlawful arrest and the excessive use of force under the Fourth Amendment").

26

is "the most difficult . . . to mount successfully." *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100 (1987). Bringing a facial challenge, it is not enough for the plaintiffs to demonstrate that the ICE-detainer mandate will often cause Fourth Amendment violations. They must establish that the mandate "is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449, 128 S. Ct. 1184, 1190 (2008).

The plaintiffs suggest that the Supreme Court's recent decision in *City of Los Angeles v. Patel*, has lowered the bar for facial Fourth Amendment challenges, but they misconstrue the case. 135 S. Ct. 2443 (2015). *Patel* rejected the contention that facial Fourth Amendment challenges are "categorically barred or especially disfavored." *Id.* at 2449. The Court did not overrule the *Salerno* standard but merely clarified that, under the unconstitutional-in-all-of-its-applications analysis, a court must "consider[] only applications of the [challenged] statute in which it *actually authorizes or prohibits conduct.*" *Id.* at 2451 (emphasis added). In other words, a facial challenge does not fail merely because exigent circumstances or a warrant could independently justify some applications of the challenged statute. *Id.* Thus, the plaintiffs must establish that every seizure authorized by the ICE-detainer mandate violates the Fourth Amendment. They have not satisfied this exacting standard.

It is undisputed that *federal* immigration officers may seize aliens based on an administrative warrant attesting to probable cause of removability. *Abel v. United States*, 362 U.S. 217, 233-34, 80 S. Ct. 683, 694 (1960). It is also evident that current ICE policy requires the Form I-247A to be accompanied by one of two such administrative warrants. On the form, an ICE officer

certifies that probable cause of removability exists. Thus, an ICE-detainer request evidences probable cause of removability in every instance. [20]

Under the collective-knowledge doctrine, moreover, the ICE officer's knowledge may be imputed to local officials even when those officials are unaware of the specific facts that establish probable cause of removability. *See United States v. Zuniga*, 860 F.3d 276, 283 (5th Cir. 2017) ("Under the collective knowledge doctrine, an officer initiating the stop or conducting the search need not have personal knowledge of the evidence that gave rise to the reasonable suspicion or probable cause, so long as he is acting at the request of those who have the necessary information."). Compliance with an ICE detainer thus constitutes a paradigmatic instance of the collective-knowledge doctrine, where the detainer request itself provides the required "communication between the arresting officer and an officer who has knowledge of all the necessary facts." *United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007).

Nevertheless, the plaintiffs make several arguments why this cooperation constitutes a *per se* violation of the Fourth Amendment. First, they defend the district court's holding that state and local officers may only arrest individuals if there is probable cause of *criminality*. The district court erred. Courts have upheld many statutes that allow seizures absent probable cause that a crime has been committed. *See Cantrell v. City of Murphy*, 666 F.3d 911, 923 (5th Cir. 2012) (state statute authorizing seizure of mentally ill); *Maag v. Wessler*, 960 F.2d 773, 775-76 (9th Cir. 1991) (state statute authorizing seizure

---

[20] The plaintiffs' suggestion that "an ICE agent may indicate simply that DHS intends to assume custody of the detainee to 'make an admissibility determination'" misrepresents Form I-247A. The box they mention applies only when DHS has transferred an alien to the local authority's custody for a proceeding or investigation and thus "intends to resume custody of the alien to complete processing and/or make an admissibility determination." *See* ICE Form I-247A, available at https://perma.cc/RH4C-5D8Q.

of those seriously ill and in danger of hurting themselves); *Commonwealth v. O'Connor*, 546 N.E.2d 336, 341 (Mass. 1989) (state statute authorizing seizure of incapacitated persons); *In re Marrhonda G.*, 613 N.E.2d 568, 569 (N.Y. 1993) (state statute authorizing seizure of juvenile runaways).  The district court's contention is also patently at odds with immigration law and procedure; civil removal proceedings necessarily contemplate detention absent proof of criminality.  *See, e.g*, *Demore v. Kim*, 538 U.S. 510, 531, 123 S. Ct. 1708, 1721-22 (2003) (upholding no-bail civil immigration detention under a Fifth Amendment Due Process challenge).[21]

The plaintiffs also argue that there is no state law authorizing local officers to conduct seizures based on probable cause of removability.  They cite *Lunn v. Commonwealth*, in which the Supreme Judicial Court of Massachusetts held that state officers had no state-law authority to carry out detention requests made in civil immigration detainers.  78 N.E.3d 1143, 1158-60 (Mass. 2017).  *Lunn* is easily distinguishable.  Here the ICE-detainer mandate itself authorizes and requires state officers to carry out federal detention requests.

The plaintiffs next contend that the Fourth Amendment requirement is not satisfied when officers must unthinkingly accept an agency's conclusions without taking into account facts tending to dissipate probable cause.  Subsection (b) of article 2.251 allegedly fails to cure this defect because it forces local officers to make removal-status determinations, running afoul of *Arizona* and *Farmers Branch*.  This argument proves too much.  Implicitly, the plaintiffs' argument would invalidate any compliance with ICE detainers:

---

[21] For these reasons, we also disavow any district court decisions that have suggested the Fourth Amendment requires probable cause of criminality in the immigration context. *See Mercado v. Dallas Cty.*, 229 F.Supp.3d 501, 512-13 (N.D. Tex. 2017); *Santoyo v. United States*, No. 5:16-CV-855-OLG, 2017 WL 2896021 (W.D. Tex. June 5, 2017).

officers *must* make their own removal-status determinations to satisfy the Fourth Amendment but officers *cannot* make such determinations under *Arizona* and *Farmers Branch.*

The plaintiffs' argument misconstrues the relevant precedents. Neither *Arizona* nor *Farmers Branch* undermines subsection (b). *Arizona* denied state officers the power to unilaterally make removability determinations because "[a] decision on removability requires a determination whether it is appropriate to allow a foreign national to continue living in the United States" and such decisions "touch on foreign relations and must be made with one voice." *Arizona,* 567 U.S. at 409, 132 S. Ct. at 2506-07. Likewise, *Farmers Branch* invalidated an ordinance requiring building inspectors to conduct their own "unlawful presence" inquiries. 726 F.3d at 532. Both cases involved unilateral status-determinations *absent federal direction.* But subsection (b) operates only when there is already federal direction—namely, an ICE-detainer request—and the subsection merely limits the scope of the officer's duty to comply with that request. It remains the ICE agent who makes the underlying removability determination. [22]

The plaintiffs are also wrong to suggest that the ICE-detainer mandate requires officers to ignore facts that negate probable cause. Subsection (b) should cover the majority of cases where facts negate probable cause: indeed, it is difficult to imagine what facts other than valid forms of identification would *conclusively* negate ICE's probable cause determination.[23] Assuming

---

[22] Because we refuse to interpret subsection (b) as authorizing unilateral removability determinations, we also reject the plaintiffs' argument that the ICE-detainer mandate is conflict preempted. In doing so, we note that Section 1357(g)(10)(B) expressly mentions cooperation in "identification" and "detention."

[23] It is important to remember that an adult alien commits a federal crime if he fails to "at all times carry with him and have in his personal possession any certificate of alien

*arguendo* that there could be such facts, Texas and the United States as *amicus* dispute that local officers would be required to ignore them. They argue that the verbs "[c]omply with, honor, and fulfill" require cooperation—not blind obedience. This seems reasonable given the assumption that ICE should have no interest in detaining aliens when local officials communicate that the original determination was flawed. Nevertheless, even if the mandate could hypothetically cause a violation, this possibility is not enough to substantiate a facial challenge.

Likewise, none of the cases the plaintiffs cite indicates that the detainer mandate is facially invalid. In *Santos v. Frederick County Board of Commissioners*, the Fourth Circuit held that, "absent express direction or authorization by federal statute or federal officials, state and local law enforcement officers may not detain or arrest an individual solely based on known or suspected civil violations of federal immigration law." 725 F.3d 451, 465 (4th Cir. 2013). Thus, the seizure in *Santos* violated the Fourth Amendment because the officers detained Santos "before dispatch confirmed with ICE that the warrant was active." *Id.* at 466. Similarly, in *Melendres v. Arpaio*, the Ninth Circuit rejected unilateral detention "based solely on reasonable suspicion or knowledge that a person was unlawfully present in the United States." 695 F.3d 990, 1000 (9th Cir. 2012). As in *Santos*, there was no federal request for assistance before the seizure. *Id.* Therefore, these decisions do not affect the ICE-detainer mandate, which always requires a predicate federal request before local officers may detain aliens for the additional 48 hours. The validity of this sort of compliance has been affirmed by at least one circuit. *See United States v. Ovando-Garzo*, 752 F.3d 1161, 1164

registration or alien registration receipt card" evidencing his lawful status. 8 U.S.C. § 1304(e).

(8th Cir. 2014) (finding the claim that a state officer could not detain an alien on behalf of federal officers "meritless").

Last, the plaintiffs argue that the mandate is facially invalid because it does not expressly require a probable cause determination. ICE policy may change, the plaintiffs argue. If that happens, compliance with subsequent detainer requests may violate the Fourth Amendment. In our view, this argument—that ICE policy may change—confirms that facial relief is inappropriate. It is true that ICE might change its policy such that compliance with ICE's requests would violate the Fourth Amendment. It is also true that, under the current scheme, seizures may occur where probable cause was lacking. But this is no basis for facial relief under *Salerno* and *Patel*. If ICE policy changes or if violations occur, the proper mechanism is an as-applied, not a facial challenge.

## IV. "Materially Limits"

Section 752.053(a)(1)-(2) forbids any "policy" or "pattern or practice" that "prohibits or materially limits" the enforcement of the immigration laws. *See* Tex. Gov't Code § 752.053(a)(1)-(2). The plaintiffs contend that the phrase "materially limits" is unconstitutionally vague on its face. In *United States v. Gonzalez-Longoria*, this court affirmed the exacting standard for establishing facial vagueness: "When a provision is so vague that it specifies 'no standard of conduct . . . at all,' then the provision 'simply has no core,' and will be vague as applied to anyone—that is, it will be facially vague." 831 F.3d 670, 675 (5th Cir. 2016) (en banc) (quoting *Smith v. Goguen*, 415 U.S. 566, 578, 94 S. Ct. 1242, 1249 (1974)). The plaintiffs have not established that "materially limits" is facially vague under this standard.

*Gonzalez-Longoria* addressed the significance of *Johnson v. United States*, which had recently invalidated the residual clause of the Armed Career Criminal Act as unconstitutionally vague. 135 S. Ct. 2551 (2015). In *Johnson*,

the Court concluded that a facial vagueness challenge could succeed even if some conduct is clearly covered by a statute's prohibition. *Id.* at 2561; *see also United States v. Westbrooks*, 858 F.3d 317, 325 (5th Cir. 2017). In *Gonzalez-Longoria*, this court adopted a "narrow[]" reading of *Johnson*'s holding as motivated by "a long-considered ill-ease and eventual repudiation of the categorical approach in the specific context of the Armed Career Criminal Act's residual clause." *Gonzalez-Longoria*, 831 F.3d at 676. Given that *Gonzalez-Longoria* construed *Johnson* narrowly and affirmed a stringent standard for facial vagueness challenges, it is telling that neither the district court nor any of the plaintiffs mention this binding decision. As their omission suggests, "materially limits" is not vague under *Gonzalez-Longoria.*

Although the plaintiffs argue that context exacerbates the vagueness of "materially limits," the opposite is true. The status-inquiry, information-sharing, and assistance-cooperation provisions of Section 752.053(b)(1)-(3) provide specific examples of what conduct local entities cannot limit. Thus, if a policy expressly limits one of these activities, then the question for a court is whether such a limitation is "material." The inclusion of this qualifier makes the challenged phrase more definite, not less, and materiality standards are routine in the law. *See, e.g.*, Fed. R. Evid. 807(a)(2). Materiality is a familiar component of fraud claims, and the full phrase "materially limit" appears in federal securities law, 15 U.S.C. § 77d-1(b)(1)(H)(i), and in the ABA model rules of professional conduct. Model R. of Prof'l. Conduct 1.7(a)(2), 1.10(a)(1). Materiality is not a vague concept, especially to actors subject to these provisions who are law enforcement or government officers.

The plaintiffs contend that Texas cannot specify any applications of the "materially limits" provision that are not flat prohibitions—and thus already covered by the word "prohibits." We disagree. Texas identifies the Maverick County Sheriff's Office policy of refusing to "participate or cooperate in the

arrests of individuals for civil immigration violations." This policy does not actually flatly prohibit cooperation; it limits the circumstances in which cooperation is permissible: criminal but not civil violations. Texas also cites El Cenizo's Mayor, who contended that the city's policy "limits the situations in which [city] . . . officials engage in immigration enforcement or collect and disseminate such information." This, too, seems like a policy best characterized as *limiting* and not *prohibiting* the enforcement of immigration laws. Almost any limitation could be recharacterized as a partial prohibition. That is likely why SB4 includes both terms. Otherwise, supporters of the policies just described could argue that their policies *limited* but did not actually *prohibit* immigration enforcement. Thus, the putative redundancy between "prohibits" and "materially limits" likely reflects "a sense of belt-and-suspenders caution" on the part of the legislature. *King v. Burwell*, 135 S. Ct. 2480, 2498 (2015) (Scalia, J., dissenting). It is no reason to facially invalidate the phrase.

Texas also proposes several narrowing constructions. First, Texas suggests that a material limit must concern "the enforcement of immigration laws" and so policies relating to "general matters like overtime and patrolling locations" would not be covered. Under this limitation, Texas argues, SB4 will "not prohibit immigration-neutral local policies regarding bona fide resource allocation." Second, Texas states that a "policy cannot 'materially limit' immigration-law enforcement if it prohibits actions that the locality already lacks the power to lawfully perform."

These limitations are reasonable. But the nature of the plaintiffs' lawsuit—a facial, pre-enforcement challenge—makes us unwilling to adopt limiting constructions that are not strictly necessary to preserve the constitutionality of a statute. In general, as-applied challenges brought in post-enforcement proceedings are "the basic building blocks of constitutional

adjudication." *See Gonzales v. Carhart*, 550 U.S. 124, 168, 127 S. Ct. 1610, 1639 (2007) (citations omitted).  Here, it is helpful to consider the many years and judicial decisions leading to the Supreme Court's invalidation of the residual clause in *Johnson*: "Nine years' experience trying to derive meaning from the residual clause convinces us that we have embarked upon a failed enterprise." *Johnson*, 135 S. Ct. at 2560.   In contrast to the extreme circumstances in *Johnson*, the posture of this case calls for judicial restraint. *See, e.g.*, *Wash. State Grange*, 552 U.S. at 450-51, 128 S. Ct. at 1191 (recognizing that pre-enforcement facial challenges are "disfavored" because they "often rest on speculation" and "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution").   For these reasons, we conclude that the "materially limits" phrase has a clear core and is not void for vagueness.

## V.  Commandeering Challenge

The plaintiffs raise an argument on appeal that was not presented to the district court.  They begin by pointing out that the Tenth Amendment prevents the Federal Government from forcing local governments to enforce federal immigration laws.   Then they state that the preemption doctrine prevents Texas from passing direct immigration-enforcement regulation. From these premises, the plaintiffs argue that, under the Texas Constitution, the state cannot preempt cities' home-rule authority without passing the sort of direct immigration regulation that would be preempted by federal law.

This argument is waived because it was not adequately raised below. *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 339-40 (5th Cir. 2005).  Even if it were not waived, this argument merely recasts a state-law home-rule-city argument as a hybrid Tenth Amendment and preemption claim. The plaintiffs' briefing indicates that this argument stems from questions asked during oral

argument on Texas's motion to stay.  The flaw in the argument is that Texas law is clear: "The Texas Constitution prohibits a city from acting in a manner inconsistent with the general laws of the state.  Thus, the legislature may, by general law, withdraw a particular subject from a home rule city's domain." *Tyra v. City of Houston*, 822 S.W.2d 626, 628 (Tex. 1991) (citations omitted).  For better or for worse, Texas can "commandeer" its municipalities in this way.

## CONCLUSION

The plaintiffs have not made a showing that they are likely to succeed on the merits of any of their constitutional claims except as to the enforcement of Tex. Gov't Code § 752.053(a)(1)'s "endorse" provision against elected officials.  The foregoing discussion demonstrates there is no merit in their remaining arguments, and none of the other challenged provisions of SB4 facially violate the Constitution.  Accordingly, we **AFFIRM** in part the district court's preliminary injunction, **VACATE** in large part and remand with instructions to **DISMISS** the vacated injunction provisions.