ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of - | ) | |
| | ) | |
| Lacy Mechanical, Inc. | ) | ASBCA No. 63153 |
| | ) | |
| Under Contract No. W912EF-16-D-0021 | ) | |

APPEARANCES FOR THE APPELLANT:     Marisa M. Bavand, Esq.
Emily A. Yoshiwara, Esq.
  Dorsey & Whitney LLP
  Seattle, WA

APPEARANCES FOR THE GOVERNMENT:   Michael P. Goodman, Esq.
  Engineer Chief Trial Attorney
Michaela M. Murdock, Esq.
  Engineer Trial Attorney
  U.S. Army Engineer District, Walla Walla

## OPINION BY ADMINISTRATIVE JUDGE EYESTER ON THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

Lacy Mechanical, Inc. (Lacy) sponsors a pass-through claim by its subcontractor Global Diving & Salvage, Inc. (Global) alleging that the United States Army Corps of Engineers (Corps or government) breached Lacy's task order when it failed to deliver safety cables with attached spelter sockets.[1] Lacy also alleges, under the theory of *quantum meruit*, that Global performed extra work at the Corps' request with the expectation it would be paid and the Corps' failure to pay is an unjust enrichment.

The Corps moves for summary judgment primarily arguing the breach claim is barred by accord and satisfaction or the related concept of release because a bilateral contract modification required Lacy attach additional sockets and spelter them. The Corps also argues Lacy cannot show an implied-in-fact contract exists to support

---

[1] Neither party defines a spelter socket, although it is not strictly necessary for us to understand it to reach our conclusions. Our review of its use online and in the context of this dispute indicates that it is a socket attached to the end of a metal cable through a poured molten resin or alloy that affixes when it hardens. *See Mechanical and Electrical Design for Lock and Dam Operating Equipment*, 2-49 to 2-50, available at https://www.publications.usace.army.mil/Portals/76/Publications/EngineerManuals/EM_1110-2-2610.pdf (last visited April 22, 2024).

entitlement under the theory of *quantum meruit*. Based on the following, we grant the Corps' motion for summary judgment.

STATEMENT OF FACTS FOR PURPOSES OF THE MOTION

*Contract/Task Order Terms*

In July 2016, the Corps awarded Lacy multiple award task order contract No. W912EF-16-D-0021 for operations, maintenance and construction activities in the Walla Walla district (R4, tab 4 at 457-58, 463). The contract incorporated by reference several clauses including Federal Acquisition Regulation (FAR) 52.242-14, SUSPENSION OF WORK (APR 1984), FAR 52.245-1, GOVERNMENT PROPERTY (APR 2012), and FAR 52.249-10, DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984) (*id.* at 468). All awarded task orders were subject to the terms and conditions of the contract (*id.* at 471).

On October 22, 2019, the Corps' Walla Walla district office issued a notice that the navigation lock at the Ice Harbor dam would be closed for maintenance from March 7-April 5, 2020 for a project (gov't mot., ex. A). Subsequently, on January 22, 2020, the Corps awarded Lacy fixed-priced task order No. W912EF-20-F-8005 in the amount of $799,550 for removal and replacement of floating guide wall anchor cables at the Ice Harbor dam (R4, tab 6 at 758-59, 825, 863).

As background, a floating guide wall guides vessels into a lock chamber. For the guide wall pertinent to this appeal, there were two ends: one end was attached to the dam and the other end was attached by steel cables to two underwater anchors, which are actually steel blocks. One anchor is along the right bank of the river (landside or shoreline anchor), and one is on the river bottom, farther from the shore (riverside or offshore anchor). (App. resp., Yoshiwara decl., ex. E at 27) As the cables had deteriorated, Lacy was to disconnect and replace a total of four service and safety cables (R4, tab 5 at 511; app. resp., Yoshiwara decl., ex. E at 27). The attachment point of the shoreline anchor was easy to access, and no sediment removal was required (app. resp., Yoshiwara decl., ex. E at 27). With respect to the two cables attached to the offshore anchor, however, Lacy was to first remove the in-water sediment and debris to access the anchor (R4, tab 5 at 511). Accordingly, the task order included two contract line item numbers (CLIN)--CLIN 01 for excavation ($475,500) and CLIN 02 for cable replacement ($324,050) (R4, tab 6 at 759).

In addition, the task order included FAR 52.211-10, COMMENCEMENT, PROSECUTION, AND COMPLETION OF WORK (APR 1984), which set forth the following schedule for the cable replacement:

2

(2)  Excavation (CLIN 0001) shall be completed no later than 29 February 2020.

(3)  The cable removal and replacement (CLIN 0002) can only be performed during the scheduled Navigation Lock outage.  The outage starts at 0600 on March 7, 2020 and ends at 2359 on April 5, 2020.  With the exception of items (4) and (5) below, the Contractor shall complete all work required for this Contract not later than 1700 on April 3, 2020. . . .

(R4, tab 6 at 762)  The task order required a pre-construction meeting where Lacy was to discuss its plan for executing the work (*id.* at 789).  Once work began, Lacy was to hold daily briefings with the government on the project's status, which included a three week look ahead for planned activities; changes to the schedule were to be recorded and included in the next scheduled update (*id.* at 790).

The task order also listed several items of government-furnished property.  As relevant here, the Corps was to provide the replacement cables, which included two safety and two service cables each with galvanized open spelter sockets attached to the ends (R4, tab 6 at 767-68).

Lacy was to use a dive team, consisting of at least five members, to remove and replace the anchor cables (R4, tab 6 at 861, 863).  Only one cable could be removed and replaced at a time (*id.* at 795).  To perform the work safely, divers were to verify the riverside anchor sediment was removed before beginning cable replacement.  To ensure adequate sediment removal at the riverside anchor, the dive supervisor was required to verify the excavation resulted in a slope to depth ratio of a minimum three feet horizontal for every one foot vertical (3:1 ratio).  (*Id.* at 862)

*Work Begins*

Lacy entered into a subcontract with Global on January 24, 2020 to excavate, dredge and replace the anchor cables (R4, tab 1 at 311-12).  The Corps issued the notice to proceed on January 27, 2020 (R4, tab 7 at 1002).

A January 29, 2020 meeting agenda to discuss the preliminary project schedule amongst Lacy and Global shows, as an open discussion/questions/concerns item, whether the dredge window could be extended beyond February 29 "to minimize down time between dredging and cable replacement. . . [to] prevent new debris from flowing/settling in and backfilling excavated cable" (app. resp., Lacy Project Manager (PM) decl., ex. C at 18).  A January 29, 2020 initial schedule showed dredging from February 24-March 2, 2020, cable installation from March 9-18, 2020, and navigation

3

lock shutdown from March 9-April 3, 2020 (*id.*, ex. B at 11).  A January 31, 2020 schedule provided to the Corps through the resident management system[2] showed dredging from February 20-29, 2020, cable installation/replacement from February 27-March 13, 2020, and navigation lock shutdown from March 7-April 3, 2020 (*id.*, ex. D at 27).

Global's first day of dredging was February 22, 2020 (R4, tab 23 at 1042).  Two days later, on February 24, 2020, the Corps asked Lacy to price a modification for the installation[3] of eight spelter sockets instead of four (R4, tab 13 at 1016-1018).  That same day, Global sent Lacy an estimate from another contractor for spelter socket installation in the amount of $12,600, which would be performed at a facility in Longview, WA "for maximum efficiency and quality control.  It is anticipated that one socket can be poured per day" (app. supp. R4, tab 12 at 139).  Global informed Lacy they "would anticipate a single extra day for the expanded scope of work" (app. supp. R4, tab 13).

February 25, 2020 meeting minutes show, under the heading "Schedule," that dredging work would "be wrapping up on Saturday" and once the dredging was complete, the crews would be off site until March 9, 2020, at which time cable installation would begin (gov't mot., ex. C at 4; app. resp., Lacy PM decl. at ¶ 16).  As confirmed by a declaration from Lacy's PM, at this meeting the parties discussed a new timeline for cable installation, March 9, because the cables would be offsite until that time (app. resp., Lacy PM decl. at ¶ 16).  The meeting minutes state that dredging would likely be completed by February 29, 2020, the date set forth in the task order (gov't mot., ex. C at 4; R4, tab 6 at 762).

On February 26, 2020, the Corps issued bilateral Modification No. 01, which added CLIN 03 for "Spelter Socket Addition" (R4, tab 8 at 1003-04).  According to the modification, Lacy was to "furnish all labor, materials, equipment, and plant, and perform all work necessary to. . . install all 8 spelter sockets on site instead of only 4 per [the] original" task order.  Further, the modification stated that a "[n]ew sole source contract was implemented to acquire the cables and sockets; however, this change will require the installation contractor to spelter 4 additional sockets.  As-Built all changes."  (*Id.* at 1004)  The modification also stated:

> It is understood and agreed that pursuant to the above, the
> contract price is increased $11,456.00, which includes all

---

[2] The contract required Lacy use this system to communicate with and help the government monitor and administer the contract (R4, tab 4 at 664-66).

[3] When we read the Corps' request for proposal and contractor's response together (*see* app. supp. R4, tab 12 at 139), we find that "the installation of the spelter sockets" refers to the act of attaching the sockets to the cables.

4

direct and indirect impact costs for both the changed and unchanged work and shall constitute full compensation for satisfactorily performing all work necessary and incidental to accomplish the work required herein. This amount includes all extended overhead and all direct and indirect impact costs for both the changed and unchanged work. . . .

The Contract completion date shall remain unchanged by this modification. . . .

By signing this supplemental agreement, Lacy Mechanical [] hereby releases the Government of all future equitable adjustments and cumulative impact and inefficiency claims attributable to Modification No. A0001.

(*Id.* at 1004) The modification did not change any dates in the schedule set forth in FAR 52.211-10, COMMENCEMENT, PROSECUTION, AND COMPLETION OF WORK (APR 1984) (*see id.*).

Lacy took delivery of the cables and spelter sockets on February 27, 2020, and signed a hand receipt evidencing transfer (R4, tab 34 at 1139-40). The next day, the cable reels and spelter sockets were sent to a subcontractor for speltering (R4, tab 23 at 1042). Global completed dredging by March 1 and uncovered the offshore anchor (app. resp., Lacy PM decl., ex. H at 70). Lacy's subcontractor delivered the speltered cables to the site on March 9, 2020 (R4, tab 23 at 1042). On March 10, 2020, Global inspected the area and discovered the excavation had backfilled (*id.*; R4, tab 2 at 442). On March 12, 2020, at the Corps' request, Lacy sent the Corps a rough order of magnitude (ROM) to re-excavate the anchor point (app. resp., Lacy PM decl., ex. I at 73-74). According to Lacy, it would cost $424,799 and required an extension of the dredging window to March 20, 2020 (*id.* at 74).

In a March 13, 2020 letter to Lacy, with the subject line reading "Notice of Noncompliance: Anchor Dredging Slope," the contracting officer expressed concern with the quality control of the anchor dredging, stating Lacy did not meet the volume dredged and proper 3:1 ratio. The contracting officer also stated that additional excavation to expose the anchor was Lacy's responsibility and an additional dredge window would be available from March 13-20, 2020. (R4, tab 17 at 1024)

On March 14, 2020, Lacy informed the Corps it could not proceed with excavation efforts due to safety concerns, namely that there was a potential for engulfment of the diver due to the collapse and infill of the excavation site as a result of the inadequacy of the task order's specified 3:1 slope (R4, tab 18 at 1027). The parties agreed to split the cost of hiring a third party to conduct a sonar scan of the

dredged area prior to additional diving (R4, tab 19 at 1028).  The Corps cleared Lacy to continue excavation on March 19, 2020 (app. supp. R4, tab 36 at 198-99).

*Work Stops Due to COVID-19*

The next day, March 20, 2020, Lacy notified the Corps that its diving contractor could not proceed due to COVID-19 concerns.  Specifically, Global could not maintain the minimum distances of separation during the diver dress and removal of gear process and the communal use of the decompression chamber and equipment created a risk of exposure for the dive team members.  (R4, tab 20 at 1030)  Global also stated that due to disruptions to the supply chain and labor supply there would be a significant, but unknown, impact on cost and schedule and therefore sought costs, schedule relief and delay impacts due to COVID-19 (*id.* at 1035).  The letter did not mention or discuss anything about late-delivered cables with unspeltered sockets (*see id.* at 1030, 1035).  On March 20, 2020, the contracting officer agreed to a time extension pursuant to FAR 52.249-10 as a result of the COVID-19 pandemic but stated that no additional costs were due to Lacy (R4, tab 21 at 1038).

On November 6, 2020, Lacy submitted a request for equitable adjustment (REA), with documentation from Global, seeking $192,378 for demobilization and remobilization due to COVID-19 and $332,137 for delays and re-excavation due to the Corps' "delay in providing materials late and out of spec[ification]" (R4, tab 23 at 1040-41).  Around December 11, 2020, the Corps proposed modifying the task order to extend the completion date (app. supp. R4, tab 47 at 221).  The proposed amendment stated Lacy would "release the Government from all future equitable adjustments and cumulative impact and inefficiency claims attributable to Modification No. A000002" (*see* app. supp. R4, tab 48 at 223).  Lacy informed Global that it would not waive its rights on prior claims or future claims but only agree to the time extension (app. supp. R4, tab 47 at 221).

On December 23, 2020, the Corps issued unilateral Modification No. 02 pursuant to FAR 52.249-10, DEFAULT (FIXED-PRICE CONSTRUCTION) which extended the task order completion date by 350 days due to the COIVD-19 pandemic and its effect on the dive operations (R4, tab 9 at 1005-06).  The modification also changed the schedule as follows:  initial excavation completed by February 29, 2020; landside cable removal and replacement during navigation lock outage; final excavation completed by February 28, 2021; riverside cable removal and replacement performed after final excavation; and all work completed by March 19, 2021.  The modification referenced Lacy's March 20, 2020 letter, which, as discussed above, addressed only its COVID-19 concerns.  The total task order price remained unchanged.  (*Id.* at 1006)  The modification did not contain any release language (*see id.*).

Lacy and Global returned to the project site on January 21, 2021 (R4, tab 1 at 8; tab 2 at 443). The Corps issued bilateral Modification No. 03, effective February 1, 2021, to add CLINs 04-07 for sonar investigation work (completed in the spring of 2020) and sonar scanning and review to remove obstructions identified during the dredging operations (R4, tab 10 at 1007-09). According to the modification, Lacy released the government from all future equitable adjustments and cumulative impact and inefficiency claims related to the modification. However, the modification also stated Lacy "expressly reserves, and does not release the Government from, any potential claims that may have arisen prior to this Modification [] or are not related to the subject matter contained herein." (*Id.* at 1009) Lacy completed the work in February 2021 (compl. ¶ 54).

On March 30, 2021, the contracting officer[4] responded to Lacy's November 6, 2020 REA on behalf of Global and noted there was no delay when the Corps delivered the cables and spelter sockets on February 27, 2020, because cable removal and replacement could only occur during navigation lock outage which began on March 7, 2020. The Corps recognized Lacy's schedule showed removal and replacement of the existing cables would begin on February 27, but noted this was not compliant with the task order. (R4, tab 31 at 1076) Further, the Corps noted that Lacy accepted and then shipped the cables and spelter sockets off site to be speltered, the materials were returned on March 9, 2020, and an updated schedule showed cable removal and replacement between March 9-20, 2020. The contracting officer also stated the materials delivered (the cables) complied with the task order and that Lacy was responsible for scheduling, speltering and delivery of the cables to a subcontractor as the government did not possess them anymore. Further, the contracting officer concluded that Lacy did not meet the slope criteria during their dredging efforts, which caused the material to slough and caused a delay. (*Id.* at 1077) The contracting officer concluded that Lacy was allowed a time extension, but not money compensation, for the time impact related to COVID-19 pursuant to the FAR default clause (*id.* at 1078).

*The Claim*

On June 18, 2021, Lacy submitted a certified claim on behalf of Global for costs due to the Corps' delay in providing the cables with spelter sockets and delays due to the COVID-19 pandemic (R4, tab 1 at 3, 9-11).[5] With respect to the cable delay claim, Global contended that during a preconstruction meeting it expressed

---

[4] By this time, the administrative contracting officer (ACO) who responded to the REA (*see* R4, tab 31 at 1078) was different than the ACO who had signed the contract modification for the speltering (*see* R4, tab 8 at 1003).

[5] The claim also addressed an issue regarding an unanticipated anchor cable for the dam exclusion boom (R4, tab 1 at 7-8, tab 25 at 1048). This issue was settled by the parties (R4, tab 12 at 1013-14).

concern regarding the potential for excavation backfill and submitted a revised schedule where the dredge window overlapped with cable replacement. Global believed the Corps approved the schedule and allowed cable replacement to occur immediately after dredging and outside the lock closure period. (*Id.* at 6) Global further argued that it completed dredging to expose the riverside anchors by March 1, 2020, but the task order compliant cables had not been delivered to the site yet and Global was therefore unable to continue work. Global maintained that once the cables were delivered on March 9, 2020, the dive barge was in position for cable replacement by March 10, 2020 but the excavation had backfilled and additional dredging was necessary. (*Id.* at 7) At this point, the Corps argued Global did not achieve the required 3:1 slope while Global argued its excavation complied with the task order (*id.* at 7-8). While additional surveying was needed, work ceased due to COVID-19. The claim states that Lacy and Global returned to the project site in January 2021 and finished the work on February 17, 2021. (*Id.* at 8)

Lacy sought $603,308.33 for changes in the scope of work (R4, tab 1 at 9). First, Lacy sought costs relating to delays pursuant to FAR 52.245-1 when the Corps failed to provide cables with spelter sockets arguing that the delay caused the dredged area to backfill and required re-excavation (*id.* at 9-10). Second, Lacy sought costs for demobilization and remobilization during the COVID-19 shutdown arguing that the Corps suspended work pursuant to FAR 52.242-14 or changed the work pursuant to FAR 52.243-4 and therefore it was entitled to an adjustment (*id.* at 10).

On October 13, 2021, the Corps rejected Lacy's claim in a contracting officer's final decision (COFD) (R4, tab 2 at 440). First, the Corps concluded that the claim for delays related to unsuitable cables was barred by accord and satisfaction (the task order modification) and waiver (*id.* at 444). Specifically, the contracting officer stated that the Corps and Lacy negotiated a solution for the government-furnished material, which resulted in a modification, and no delay existed because Lacy was prohibited from installing cables prior to the March 7, 2020 lock outage per the terms of the task order (*id.* at 444-45). The contracting officer denied that the Corps approved installation of the cables prior to the lock outage window and stated such a change required a bilateral modification (*id.* at 445).

Second, the contracting officer stated it never suspended work due to COVID-19 but rather provided additional time pursuant to FAR 52.249-10 (R4, tab 2 at 446-47). The contracting officer concluded Lacy was not entitled to compensation pursuant to that clause or the changes clauses because this was a fixed-priced task order and the Sovereign Acts defense applied (*id.* at 448-49). Further, the contracting officer concluded Lacy was not entitled to compensation under the suspension clause because there was no unreasonable delay by the Corps (*id.* at 447-48). This appeal ensued.

<u>DECISION</u>

In Count I of its complaint, Lacy argues the Corps approved early attachment of the cables and then breached the task order and caused a delay when it failed to timely deliver the cables with attached spelter sockets (compl. ¶¶ 58-63). In Count II, Lacy argues, under the theory of *quantum meruit*, that Global performed extra work at the Corps' request, with an expectation it would be paid for this work, and the Corps' failure to pay constitutes an unjust enrichment (*id.* ¶¶ 64-68).

The Corps has moved for summary judgment seeking dismissal of the entire appeal. Specifically, the Corps argues it never approved early cable installation, there was no breach as it delivered the government-furnished property in accordance with the task order and modification, the claim is barred by accord and satisfaction and release, Lacy cannot recover monetary damages due to COVID-19 delays, and the claim for entitlement under the theory of *quantum meruit* must be dismissed as there was no implied-in-fact contract (gov't mot. at 9-23).

Summary judgment is appropriate only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A material fact is one that may affect the outcome of the decision. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

***Delay Claim***

***Breach of Task Order***

First, the Corps moves for summary judgment arguing it delivered the cables to the project site on February 25, 2020, and that although the cables needed additional spelter work prior to installation, the parties agreed to a bilateral modification to resolve this issue (gov't mot. at 9). According to the Corps, there is no dispute it delivered the cables within the task order's timeline and Lacy accepted them, all in sufficient time to complete the work by April 3, 2020 (*id.* at 9-10). As such, the Corps argues there is no breach and no delay (*id.* at 9).

The Corps also argues that Lacy's delay claim relies on the premise that the Corps permitted early installation of the cables, i.e., between February 27-March 13, 2020 (gov't mot. at 12). According to the Corps, the task order contains unambiguous language restricting installation between March 7-April 5, 2020 (the navigation lock outage), Lacy has failed to provide documents supporting its allegation, and only the contracting officer has the authority to change or revise the task order (*id.* at 12-13). The Corps also argues that it did not give permission to begin replacement early

9

despite claims by Lacy it provided such permission during the January 29th meeting (*id.* at 13).

Lacy argues the Corps changed the schedule and allowed Lacy to install the offshore cables before lock closure. This meant Global could have installed the cables immediately on March 1, 2020 if the Corps had provided them speltered, as required by the task order. (App. resp. at 9) Lacy relies primarily on a schedule it submitted after the preconstruction meeting showing cable installation beginning on February 27, 2020 (*id.* at 10). Further, Lacy states that there is evidence the Corps recorded the January 29, 2020 pre-construction meeting but has not yet produced a copy (*id.* at 13). In addition, Lacy argues the Corps is estopped from asserting it did not have authority to, and therefore did not, verbally modify the task order (*id.* at 15-16).

While there is a factual dispute regarding whether the Corps permitted early installation as Lacy contends, resolution of that dispute is not necessary here. On February 26, 2020, the parties agreed to a bilateral modification addressing the Corps' delivery of unspeltered sockets and Lacy's obligation to spelter them. The bilateral modification did not change the final date for excavation or cable installation or any other dates in the schedule set forth in FAR 52.211-10, COMMENCEMENT, PROSECUTION, AND COMPLETION OF WORK (APR 1984) (R4, tab 8 at 1003-04). We address this modification next.

### *Accord and Satisfaction and Release in Modification No. 01*

The Corps argues that Lacy's breach claim is barred because bilateral Modification No. 01 constitutes an accord and satisfaction and included a release (gov't mot. at 10-12). Lacy contends the modification covers only the material handling and labor to install the eight spelter sockets and the modification is silent on the extra dredging work. Lacy further contends the Corps requested a ROM for the additional dredging work when the backfill occurred thereby evidencing the Corps did not consider this work to be within the scope of the modification. (App. resp. at 17)

While an accord and satisfaction and a release are separate defenses, an agreement may be both, either of which may bar future claims. *Holland v. United States*, 621 F.3d 1366, 1377 (Fed. Cir. 2010) (citations omitted). An accord and satisfaction occurs when "some performance other than that which was claimed to be due is accepted as full satisfaction of the claim." *Id.* "Accord and satisfaction has been 'aptly described' as a four-part test of 'proper subject matter, competent parties, meeting of the minds of the parties, and consideration.'" *Meridian Eng'g Co. v. United States*, 885 F.3d 351, 1363 (Fed. Cir. 2018) (quoting *Brock & Blevins Co. v. United States*, 343 F.2d 951, 955 (Ct. Cl. 1965)). A release, on the other hand, is when a party abandons a claim or relinquishes a right that could be asserted against another. *Holland*, 621 F.3d at 1377 (citation omitted). For either defense, the government "must show that both parties

intended [the bilateral modification] to release and/or discharge the claim[s] that [are] the subject of this appeal." *Optex Sys., Inc.*, ASBCA No. 58220, 14-1 BCA ¶ 35,801 at 175,097.[6]

Here, Lacy claims the government was to provide speltered cables by a certain date but did not. Bilateral Modification No. 01, which added CLIN 03 for "Spelter Socket Addition," specifically addressed the government's failure to provide the government-furnished property as initially set forth in the task order. As noted, the modification stated Lacy would "furnish all labor, materials, equipment, and plant, and perform all work necessary to. . . install all 8 spelter sockets on site instead of only 4 per [the] original" task order and would therefore "require the installation contractor to spelter 4 additional sockets." (R4, tab 8 at 1004) Global itself prepared the estimate, using another contractor, for spelter socket installation and knew that one socket would be poured per day (app. supp. R4, tab 12 at 139). Further, Global informed Lacy they "would anticipate a single extra day for the expanded scope of work" (app. supp. R4, tab 13). Despite their concerns about potential backfill of the area, neither Lacy nor Global addressed the matter and only sought the cost of the additional work, which the government included in the modification (*see* R4, tab 8 at 1004). The Corps provided Lacy the cables and Lacy accepted them. Lacy therefore accepted this substituted performance.

Lacy argues the subject matter of the modification is additional cable installation and speltering, not extra dredging work (app. resp. at 17). But it is this additional cable installation and speltering that Lacy alleges caused the delay and the need for the extra dredging. In the claim, Lacy seeks costs for delays pursuant to FAR 52.245-1, GOVERNMENT FURNISHED PROPERTY (R4, tab 1 at 9-10). Specifically, Lacy alleges the Corps breached the task order by failing to provide cables with attached spelter sockets thereby allegedly causing a delay and the dredged area to backfill (R4, tab 1 at 9-10; compl. ¶¶ 59-62). The crux of Lacy's appeal, therefore, is that the Corps delivered the sockets unspeltered and "late," which is precisely the subject matter of the bilateral modification.

As noted above, the modification included a release stating: "Lacy Mechanical [] hereby releases the Government from all future equitable adjustments and cumulative impact and inefficiency claims attributable to Modification No. A0001" (R4, tab 8 at 1004). Lacy does not argue the release language is ambiguous or

---

[6] Neither party raises the issue of whether the accord and satisfaction defense requires a pre-existing dispute. *See Supply & Service Team GmbH*, ASBCA No. 59630, 17-1 BCA ¶ 36,678 at 178,600 (discussing requirement for pre-existing dispute). If this were an issue here, as in *Supply & Service Team*, regardless of whether or not this was technically an accord and satisfaction, the terms of the bilateral contract modification would have the same effect. *See id.*

11

otherwise bars the claim with one exception: Lacy argues the parties continued to consider the matter, evidencing they did not construe the modification and the release as constituting an abandonment of this claim issue (app. resp. at 17).

We may refuse to apply the defense of accord and satisfaction to bar a claim where the parties continue to consider the claim after execution of a release, since that conduct may indicate that the parties did not construe the release as abandonment of the claim. *England v. Sherman R. Smoot Corp.*, 388 F.3d 844, 849-50 (Fed. Cir. 2004) (quoting *Cmty. Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575 (Fed.Cir.1993)). It is important to note that the case law here says we "may" not "must" refuse to apply the defense. *See id.*

Lacy's argument that the parties had not construed the modification's release as an abandonment of the claim rests solely on the one request by the government for a ROM for the additional dredging work when it learned the excavation had backfilled (app. resp. at 17). The agency acknowledges it requested a ROM from Lacy and submitted a declaration by the ACO stating that had the site backfilled due to a differing site condition, the government would have been liable for the rework (gov't reply, ACO decl. at 3-4).

As a reminder, the agency issued the bilateral modification on February 26, 2020. The record shows that Lacy discovered the backfilled area on March 10, 2020, and per the Corps' request, Lacy sent its rough order of magnitude cost impact of $424,799 on March 12, 2020 (*see* R4, tab 18 at 1027; app. resp., Lacy PM decl., ex. I at 74). The next day, the contracting officer expressed concern, in a letter with the subject noncompliance of anchor dredging slope, that Lacy did not meet the proper 3:1 ratio. The contracting officer also stated that additional excavation to expose the anchor was Lacy's responsibility and an additional dredge window would be available from March 13-20, 2020. (R4, tab 17 at 1024) On March 14, 2020, Lacy responded and asserted the collapse and infill were due to the task order's inadequate 3:1 slope ratio; the letter does not discuss the "late" furnished spelter sockets (R4, tab 18 at 1027). Therefore, this one instance--the request for the ROM--does not indicate the parties continued to consider the claim issue, especially since at this time, Lacy had not yet even mentioned it.

Because there was additional correspondence between the parties after the Corps' request for a ROM, we reviewed the entire record to see if there were instances evidencing the Corps had not construed the release as an abandonment of the claim. For example, on March 20, 2020, Lacy notified the Corps that its diving contractor could not proceed due to COVID-19 concerns and requested costs and relief for schedule and delay impact; the letter never mentioned the "late" delivered cables with unspeltered sockets (R4, tab 20 at 1030, 1035). On November 6, 2020, Lacy submitted an REA seeking costs for demobilization and remobilization due to COVID-

19 *and* costs for delays and re-excavation due to the Corps providing the material late (R4, tab 23 at 1040-41).  This is the first time Lacy discusses the "late" delivered material.

Next, on December 23, 2020, the agency modified the task order pursuant to FAR 52.249-10, DEFAULT (FIXED-PRICE CONSTRUCTION), which extended the task order completion date due to the COVID-19 pandemic (R4, tab 9 at 1005-06). While the modification did not contain any release language, the modification covered only Lacy's March 20, 2020 letter addressing the COVID-19 concerns.  (*Id.* at 1006)

In addition, on March 30, 2021, the contracting officer denied Lacy's November 6, 2020 REA on behalf of Global stating there was no delay when the Corps delivered the cables and spelter sockets on February 27, 2020 because cable removal and replacement could only occur during navigation lock outage which began on March 7, 2020 (R4, tab 31 at 1076).  The Corps further noted that Lacy took possession of the cables and then shipped them and the sockets off site to be speltered, and there was no evidence the material was noncompliant when delivered (*id.* at 1077).

To be clear, in the response to this REA the contracting officer did not specifically mention the modification or the release language in the modification. Lacy, however, does not argue that this omission has any bearing upon the effect of the modification's release.  In addition, the response was a more informal response to an REA (as opposed to a claim), noted that Lacy was responsible for the speltering of the sockets, and issued more than a year after the subject modification (and by a different contracting officer than the one who agreed to the modification).  We therefore conclude it is not a material fact altering our view of the release especially since Lacy opted not to argue it.

Later, on October 13, 2021, the Corps rejected Lacy's claim in a COFD, specifically stating that the claim for delays related to unsuitable cables was barred by accord and satisfaction (the task order modification) and waiver (R4, tab 2 at 444). The contracting officer iterated that the Corps and Lacy negotiated a solution for the government-furnished material, which resulted in a modification (*id.* at 444-45).

In sum, nothing in the record, including the request for a rough order of magnitude, evidences the Corps continued to consider and negotiate the "late delivery" claim.  Rather, the record shows that after issuing bilateral Modification No. 01 and upon learning of the backfill, the Corps was concerned that Lacy/Global did not achieve the dredge ratio.  Further, the contracting officer stated several times that Lacy's claim concerning late government-furnished material had no basis in the task order (as modified) as Lacy was responsible for speltering the cables, and therefore the claim was barred by accord and satisfaction.  *Compare The Haskell Co.*, ASBCA

13

No. 63291, 24-1 BCA ¶ 38,537 at 187,334-35 (concluding no meeting of the minds where contracting officer never cited the modification as a basis for denial of a claim and continued to consider the weather impact claims after the modification). Accordingly, we grant the Corps' motion for summary judgment on Count I of Lacy's complaint.

### COVID-19 Allegations

The Corps states that while COVID-19 is not specifically alleged in Lacy's complaint, Lacy stated in its response to interrogatories it was pursuing this matter (gov't mot. at 14 n.1). The Corps argues that Lacy cannot recover monetary damages due to delayed or suspended work pursuant to FAR 52.242-14 (*id.* at 14). Specifically, the Corps contends that neither it nor Lacy suspended work due to COVID-19 but that it was Global's decision not to proceed (*id.* at 14-15). The Corps makes several other arguments, but we need not address them here. We conclude Lacy did not allege this in its complaint and in fact, concedes this argument as it did not provide any response in its brief. Accordingly, Lacy cannot claim entitlement to monetary damages due to COVID-19 delays pursuant to FAR 52.242-14.

### Entitlement to Quantum Meruit

Finally, the Corps argues Lacy cannot recover under its *quantum meruit* theory because entitlement to damages in *quantum meruit* requires an implied-in-fact contract and Lacy cannot show such a contract existed and has even failed to plead, let alone produce evidence showing the elements of such a contract (gov't mot. at 18-21). Further, the Corps argues that *quantum meruit* recovery is precluded when an express contract exists (*id.* at 22-23).

Lacy argues that an implied-in-fact contract exists here because all parties agreed that Lacy had to halt performance due to COVID-19, demobilize and later return to complete the work (app. resp. at 18). According to Lacy, the task order required it mobilize and demobilize once and therefore the remobilization and later demobilization the second time was "an entirely supplemental effort" (*id.* at 18-19).

Pursuant to the Contract Disputes Act, the Board has jurisdiction over "any express or implied contract" for the procurement of property or services. 41 U.S.C. § 7102(a); *ASFA Constr. Indus. and Trade, Inc.*, ASBCA No. 57269, 15-1 BCA ¶ 36,034 at 176,004 (citing 41 U.S.C. § 7102(a)). Recovery under the theory of *quantum meruit* is typically based on an implied-in-law contract; the Board lacks jurisdiction to consider such claims. *Lee v. United States*, 895 F.3d 1363, 1373 (Fed. Cir. 2018) (citation omitted); *Relyant Glob. LLC*, ASBCA Nos. 63024, 63257, 22-1 BCA ¶ 38,205 at 185,539. Likewise, the Board lacks jurisdiction to consider a claim for unjust enrichment because it is also based on a contract implied-in-law.

*Cross Cnty. Indus., Inc. v. United States*, 231 Ct. Cl. 899, 901 (1982); *Relyant Glob. LLC*, *supra*.

An appellant, however, may use *quantum meruit* as a measure of damages for breach of an implied-in-fact contract. *Lee*, 895 F.3d at 1374; *United States v. Amdahl Corp.*, 786 F.2d 387, 393 (Fed. Cir. 1986). The Board possesses jurisdiction to consider appeals based on an implied-in-fact contract. *Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1354 (Fed. Cir. 2011); *Relyant Glob. LLC*, *supra*.

As noted, Count I of Lacy's complaint contends that "[i]n the Task Order, [the Corps] promised to deliver safety cables with spelter sockets attached," and when the Corps failed to do so, "Global was delayed in completing its contractual scope of work" (compl. ¶¶ 59-62). In Count II of its complaint, Lacy alleges Global performed extra work with the expectation of being paid and therefore the Corps was unjustly enriched, and Lacy/Global are entitled to recover in *quantum meruit* (*id.* ¶¶ 64-68). Lacy is pursuing Count I based on an express contract and Count II on an implied-in-fact contract.

As the Court of Appeals for the Federal Circuit has explained, "[i]t is well settled that 'the existence of an express contract precludes the existence of an implied-in-fact contract dealing with the same subject matter, unless the implied contract is entirely unrelated to the express contract.'" *Lee*, 895 F.3d at 1370 (quoting *Bank of Guam v. United States*, 578 F.3d 1318, 1329 (Fed. Cir. 2009) (quoting *Schism v. United States*, 316 F.3d 1259, 1278 (Fed. Cir. 2002) (*en banc*)). The task order here required excavation and cable removal and replacement at Ice Harbor. Lacy cannot contend that the "supplemental effort" of demobilization and remobilization to excavate and perform cable removal and replacement at Ice Harbor is entirely unrelated to the fixed-priced task order (express contract) requiring Lacy to complete the exact same work. *See Relyant Glob. LLC, supra* (dismissing for failure to state a claim appellant's implied-in-fact contract theory because appellant did not and could not contend the additional work was "entirely unrelated to the express contract"). Accordingly, the Board grants the Corps' motion for summary judgment on Count II

of the complaint as there are no disputed material facts that the express contract here precludes the existence of the alleged implied-in-fact contract.

<u>CONCLUSION</u>

The Board grants the government's motion and dismisses this appeal.

Dated: June 4, 2024

LAURA EYESTER
Administrative Judge
Armed Services Board
of Contract Appeals

I <u>concur</u>

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 63153, Appeal of Lacy Mechanical, Inc., rendered in conformance with the Board's Charter.

Dated: June 4, 2024

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals